IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07 CV _____

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.

ERIC R. MAJORS and
JOSHUA N. WOLCOTT,

                Defendants.

---

## COMPLAINT

---

Plaintiff, the Securities and Exchange Commission (the "Commission"), alleges that:

### SUMMARY

1.      This matter centers on a fraudulent scheme beginning in 2000 and continuing through at least February 2005 in which Eric R. Majors ("Majors"), the chief executive officer of Maximum Dynamics, Inc. ("Maximum" or "the company"), and Joshua A. Wolcott ("Wolcott"), the company's chief financial officer, used sham contracts with fictitious consultants to funnel proceeds from the sale of unregistered stock back to the company and themselves, all in violation of the registration, anti-fraud, and reporting provisions of federal securities laws.

2.      Majors and Wolcott (collectively "the defendants") devised, directed, and participated in a fraudulent scheme that disguised the true purpose of the sale of millions of shares of stock purportedly registered on Forms S-8.

3.     Form S-8 may be used to register a company's issuance of securities to consultants only if the consultants provide *bona fide* services and the services are not in connection with the offer or sale of securities in a capital-raising transaction ("S-8 shares"). Contrary to these requirements, Majors and Wolcott directed Maximum to issue S-8 shares in the names of individuals who did not perform services for the company.   Majors and Wolcott then sold the S-8 shares to the public via brokerage accounts opened in the names of fictitious consultants and distributed the proceeds to themselves, Maximum, and others.

4.     To evade the disclosure requirements associated with registering securities under federal law and to create support for misrepresentations in statements to the public touting the company's employment of outside consultants, the defendants, among other things, created and signed sham consulting contracts; opened and controlled nominee brokerage accounts in the names of fictitious consultants using purchased identities; signed, certified, and filed reports with the Commission containing material misstatements and omissions; and instructed others to provide false information to the Commission.

5.     As a result of the defendants' conduct, investors were not informed that expenses for consulting services were actually payments in a capital-raising/kick-back scheme; that the company's highly-touted consultants in Mexico did not, in fact, exist; that Majors and Wolcott had not filed all of the required reports regarding their beneficial ownership of Maximum stock; and that the company's public filings contained material misstatements and omissions, including understating officers' compensation and officers' stock ownership, overstating third party consulting fees and software license fees, and misrepresenting services provided to the company by outside consultants.

6.     Through the activities alleged in the Complaint, the defendants, directly or indirectly, have engaged, and unless enjoined, will continue to engage in transactions, acts, practices, and courses of business which are violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)]; Sections 10(b), 13(d) and 16(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b), 78m(d), 78p(a)]; and Rules 10b-5, 13a-14, 13d-2, 16a-2, and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13d-2, 240.16a-2, 240.16a-3].   Further, the defendants aided and abetted Maximum's violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

7.     As detailed below, the Commission seeks an injunction restraining and enjoining the defendants from violating, or aiding and abetting violations of, relevant sections of federal securities laws and regulations; an order requiring defendants to disgorge ill-gotten gains and pay civil penalties; an order barring defendants from participating in the offer of penny stocks; an order barring defendants from serving as an officer or director of any company required to file reports with the Commission; and the grant of such other relief as is appropriate.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action under Section 22(a) of the Securities Act and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§   77v(a), 78u(e), 78aa].   The defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

9.      Venue is appropriate in this Court under Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a), 78aa] because many of the defendants' acts and transactions constituting violations of federal securities law occurred in this district.   In addition, Maximum was a Colorado corporation, Wolcott is a resident of this district, and Wolcott and Majors were residents of this district during all or part of the time period relevant to the acts alleged in this Complaint.

## DEFENDANTS

10.     **Majors,** age 37, who resided in Colorado Springs, Colorado at times relevant to the conduct alleged in this Complaint and who currently resides in South Africa, was the founder, chairman of the board of directors, and chief executive officer of Maximum from its inception until at least April 4, 2005.

11.     **Wolcott,** age 33, who resides in Denver, Colorado, was the chief financial officer and a director of Maximum from about October 2002 until he resigned from the company in April 2005.

## MAXIMUM DYNAMICS

12.     Maximum was incorporated in Colorado on August 23, 2000 and, at times relevant to the conduct alleged in this Complaint, maintained its principal office in Colorado Springs, Colorado.  On February 25, 2002, the company registered its common stock with the Commission pursuant to Section 12(g) of the Exchange Act and thereafter was obligated to file annual and quarterly reports.   The company's common stock was a penny stock quoted on the OTC Bulletin Board from about September 2002 until about February 2005.

13.     Maximum claimed in its December 31, 2003, annual report filed with the SEC to be an "international projects management company" with offices in at least three countries and

projects in "mobile logistics, mobile commerce, village banking, business process management, enterprise application integration, supply chain management and procurement, bank offices services, wireless Internet connections in urban and rural settings, commodities trading, alternative fuel and economic development businesses."

14.     The State of Colorado administratively dissolved the corporate entity on January 31, 2005 for failure to meet State reporting obligations.  The company closed its offices in Colorado on March 12, 2005, but continued to claim that it maintained a "global operations center" in Parklands, South Africa.

## THE SCHEME

### Background

15.     In or around 1998 or 1999, Majors requested that Victor Angel ("Victor"), a Mexican citizen working in Colorado Springs, Colorado, assist him in locating persons in Mexico who would allow him to use their identities in exchange for stock in a new, un-named company.   Majors did not tell Victor that he intended to use the identities to distribute Maximum stock.

16.     In or before 2000, Victor supplied Majors with copies of passports and other personal identification documents belonging to his cousin, Ernesto Angel ("Ernesto"); Ernesto's father-in-law, Jesus Romero ("Romero"); Hugo Colomer Ballesteros ("Hugo"); and Hugo's mother, Graciela Colomer Ballesteros ("Graciela"), all Mexican citizens residing in Mexico.

17.     In 2000, Majors directed Maximum to offer and sell restricted common stock to Ernesto; Europa Global, Inc. ("Europa"), a Colorado corporation that listed Ernesto as its president; Elektra Marketing, Inc., a Colorado corporation for which Graciela purportedly acted as a director; and Romero.

18.     On November 14, 2000, Majors created a contract between Maximum and Elektra Marketing, Inc. in which he falsely stated that Graciela was the director of Elektra Marketing. According to the supposed contract, Elektra was to provide "hedge fund administration market research" in exchange for 475,000 shares of Maximum common stock valued at $9,500. Elektra Marketing was a sham, a fact that Majors knew because he created the supposed company. Graciela, who was an elderly housewife in Mexico, did not know anything about hedge fund administration market research or Elektra Marketing. Majors used the untrue statements in the contract to obtain control of the 475,000 shares that Maximum issued in the name of Elektra Marketing.

19.     On December 12, 2000, Majors created a contract between Maximum and Europa, in which he falsely stated that Ernesto was the president of Europa and that Europa had licensed "Datalus" hedge fund administration software to Maximum in exchange for 2,000,000 shares of common stock valued at $40,000. Europa was a sham, a fact that Majors knew because he also created this supposed company. Ernesto was not associated with Europa and did not learn of Maximum's existence until about October 2003. Majors used the untrue statements in the contract to obtain control of the 2,000,000 shares that Maximum issued in the name of Europa.

20.     On February 25, 2002, Majors falsely stated in Maximum's registration statement filed with the SEC that Maximum had issued 625,000 shares valued at $12,500 to Ernesto in August 2000 in exchange for business planning services rendered during the start-up stage of the company. However, as Majors knew, Ernesto did not receive the stock and did not provide business planning services to Maximum.

## Fictitious Contracts and Consulting Services
## in Exchange for S-8 Stock

21.     Beginning in December 2002, Majors and Wolcott directed Maximum to offer and sell shares to Hugo, Ernesto, and Romero under a series of fictitious consulting contracts where Hugo, Ernesto, and Romero supposedly provided consulting services in exchange for Maximum stock.  The Maximum stock was to be registered using Form S-8.  As Majors and Wolcott knew, the consulting contracts with Hugo, Ernesto, and Romero were a fraud from the beginning.

22.     Neither Hugo, Ernesto, nor Romero signed a contract, provided consulting services, or received compensation from Maximum.  Rather, the fictitious contracts were a means to justify the issuance of shares of the company's stock and to raise capital.  In addition, instead of sending the certificates to their owners, Wolcott deposited them in brokerage accounts established in Romero's and Ernesto's names but kept under Majors' and Wolcott's direction and control (the "nominee brokerage accounts").

23.     Majors and Wolcott also directed Maximum to offer and sell shares to other purported consultants in Mexico, South Africa, and Costa Rica in exchange for services; the stock was to be registered using Form S-8.  As Majors and Wolcott knew, the true purpose of these offers and sales was to raise capital.  Instead of delivering the stock certificates to their owners, the certificates were physically delivered to Wolcott in Colorado and then transferred to Ernesto's or Romero's name and deposited in the nominee brokerage accounts.

### The December 2002 Contract

24.     On December 16, 2002, Majors created and signed a contract between Maximum and Hugo which falsely stated that Hugo was to provide "software design" and "software engineering" services to Maximum in exchange for 750,000 shares of S-8 stock.   At the time,

Hugo did not know about Maximum Dynamics.  Majors and Wolcott used the untrue statements in the contract to obtain control of the 750,000 shares that Maximum issued in Hugo's name.

25.     On or about January 10, 2003, Majors and Wolcott authorized Maximum to offer, sell, and issue stock certificate 201 for 750,000 shares in Hugo's name.  Certificate 201 was physically delivered to Wolcott.  Instead of sending the shares to Hugo, certificate 201 was transferred on May 16, 2003 into Hugo's name as certificate 239 for 575,000 shares.  Wolcott deposited certificate 239 in a nominee brokerage account and caused the remaining shares to be issued to a third party.

26.     Majors and Wolcott signed, and then caused Maximum to file with the SEC on December 20, 2002, a Form S-8 registration statement that purported to register the company's offer and sale of 750,000 shares to Hugo.  The Form S-8 registration statement did not effectively register the 750,000 S-8 shares because Hugo was not a consultant to the company, did not provide bona fide services to Maximum, and the shares were issued as part of Majors' and Wolcott's capital raising scheme.

The March 2003 Contracts

27.     On March 11, 2003, Wolcott created and signed a contract between Maximum and Hugo and Jamie Marquez ("Marquez") which represented that Hugo and Marquez were to provide "software engineering, technology consulting, software design, and programming" for Maximum in exchange for 1,000,000 shares each of S-8 stock.  The statements in the contract about the services that Hugo and Marquez were to provide were untrue.  Wolcott used the untrue statements to obtain control of 2,000,000 shares of S-8 stock that Maximum issued in Hugo's and Marquez's names.

28.     On March 14, 2003, Majors created and signed a contract between Maximum and Connie Gargano ("Gargano") which stated that Gargano was to provide services related to setting up an office for Maximum in South Africa in exchange for 1,296,000 shares of S-8 stock. Majors used the statement in the contract to obtain control of 1,296,000 shares of S-8 stock that Maximum issued in Gargano's name.

29.     On March 17, 2003, Wolcott created and signed a contract between Maximum and Henry Esquivel ("Esquivel") which stated that Esquivel was to provide "business development services" in the "financial services sector" in exchange for 1,000,000 shares of S-8 stock.  Wolcott used the statement in the contract to obtain control of 1,000,000 shares of S-8 stock that Maximum issued in Esquivel's name.

30.     On or about June 26, 2003, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 249 for 1,000,000 shares in Hugo's name.  Wolcott sent a letter instructing the transfer agent to deliver Hugo's certificate directly to Wolcott.  Instead of sending the certificate to Hugo, its supposed owner, certificate 249 was transferred into Romero's name as certificate 259 and deposited in a nominee brokerage account.

31.     On or about June 26, 2003, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 251 for 1,000,000 shares in Marquez's name.  Wolcott sent a letter instructing the transfer agent to deliver Marquez's certificate directly to Wolcott.  Instead of sending the certificate to Hugo, its supposed owner, certificate 251 was transferred into Ernesto's name as certificate 260 and deposited in a nominee brokerage account.

32.     On or about June 36, 2003, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 248 for 1,296,000 shares in Gargano's name.  Although Gargano listed an address in South Africa, Wolcott sent a letter instructing the transfer agent to deliver the

certificate directly to Wolcott.   Instead of sending the certificate to Gargano, its supposed owner, certificate 248 was transferred into Romero's name as certificate 256 and deposited in a nominee brokerage account.

33.     On or about June 26, 2003, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 252 for 794,000 shares in Esquivel's name.  Although Esquivel listed an address in Costa Rica, Wolcott sent a letter instructing the transfer agent to deliver the certificate directly to Wolcott.  Esquivel did not receive the certificate.  Instead, certificate 252 was transferred on July 23, 2003, into Ernesto's name as certificate 258 and deposited in a nominee brokerage account.

34.     Majors and Wolcott signed and then caused Maximum to file with the SEC on June 25, 2003, a Form S-8 which purported to register the company's offer and sale of 1,000,000 shares issued in Hugo's name; 1,000,000 shares issued in Marquez's name; 1,296,000 shares issued in Gargano's name; and 794,000 shares issued in Esquivel's name under the March 2003 consulting contracts described above.  The Form S-8 registration statement did not effectively register the S-8 shares issued in Hugo's name because Hugo was not a consultant to the company, did not provide bona fide services to Maximum, and the shares were issued as part of Majors' and Wolcott's capital raising scheme.  The Form S-8 registration statement also did not effectively register the shares issued in the names of Marquez, Gargano, and Esquivel because these shares were issued as part of Majors' and Wolcott's capital raising scheme.

### The October 2003 Contract

35.     On October 8, 2003, Wolcott created and signed a contract between Maximum
and Pamela Grant ("Grant") of South Africa, which stated that Grant was to provide "business
development and sales" services in exchange for 425,000 shares of S-8 stock.

36.     On or about October 9, 2003, Majors and Wolcott directed Maximum to offer,
sell, and issue stock certificate 291 for 375,000 shares in Grant's name.  Wolcott picked up the
certificate in person.  Instead of sending the certificate to Grant in South Africa, certificate 291
was transferred on October 17, 2003, into Ernesto's name as certificate 294 and deposited in a
nominee brokerage account.

37.     Majors and Wolcott signed and then caused Maximum to file with the SEC on
October 7, 2003, a Form S-8 which purported to register the company's offer and sale of 425,000
shares issued in Grant's name.  The Form S-8 registration statement did not effectively register
375,000 of the S-8 shares because they were issued as part of Majors' and Wolcott's capital
raising scheme.

### The December 2003 Contracts

38.     On December 4, 2003, Wolcott created and signed a contract between Maximum
and Ernesto and Romero which stated that Ernesto and Romero were to provide "technology
development services, business development services, and engineering services" for Maximum
in exchange for 450,000 and 400,000 shares, respectively, of S-8 stock.  Wolcott sent a letter by
fax instructing the transfer agent to deliver the certificate directly to him.

39.     On December 4, 2003, Wolcott created and signed a contract between Maximum
and Constance Maccioni ("Maccioni"), which stated that Constance Maccioni was to provide

"infrastructure development and operations" for Maximum in exchange for 1,150,000 shares of S-8 stock.

40.    On or about December 18, 2003, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 308 for 450,000 shares in Ernesto's name; stock certificate 309 for 400,000 shares in Romero's name; and stock certificate 330 for 1,150,000 shares in Maccioni's name as payment for consulting services.  Instead of sending the certificate to Maccioni, its supposed owner, certificate 330 was transferred on January 2, 2004, into five certificates held in five different names:  certificate 370 for 250,000 shares issued to Ernesto; certificate 371 for 300,000 shares issued to Europa; certificate 372 for 250,000 shares issued to Romero; certificate 373 for 250,000 shares issued to Wolcott; and certificate 374 for 100,000 shares issued to Maccioni.

41.    Majors and Wolcott signed and then caused Maximum to file with the SEC on December 16, 2003, a Form S-8 which purported to register the company's offer and sale of 450,000 shares to Ernesto; 400,000 shares to Romero; and 1,150,000 shares to Maccioni under the consulting contracts described above.  The Form S-8 registration statement did not effectively register the 850,000 shares issued in Ernesto's and Romero's names because they were not consultants to the company, did provide bona fide services to Maximum, and the shares were issued as part of Majors' and Wolcott's capital raising scheme.  The Form S-8 registration statement did not effectively register 1,050,000 of the 1,150,000 shares issued in Maccioni's name because at least 1,050,000 of the shares were issued as part of Majors' and Wolcott's capital raising scheme.

The January 2004 Contract Addendum

42.     On January 20, 2004, Wolcott created and signed an addendum to the December 4, 2003 consulting contract, which falsely stated that Ernesto and Romero were to provide additional consulting services in exchange for 1,500,000 and 400,000 shares, respectively, of S-8 stock.  On or about March 1, 2004, Majors and Wolcott directed Maximum to offer, sell, and issue stock certificate 448 for 450,000 shares in Ernesto's name, and stock certificate 450 for 400,000 shares in Romero's name. Wolcott sent a letter by fax instructing the transfer agent to issue the certificates for 1,500,000 shares in Ernesto's name and 500,000 shares in Romero's name, but directed that the certificates be delivered to Wolcott.

43.     Majors and Wolcott signed and then caused Maximum to file with the SEC on February 27, 2004, a Form S-8 which purported to register the company's offer and sale of 1,500,000 shares to Ernesto and 400,000 shares to Romero under the addendum.  The Form S-8 registration statement did not effectively register the 1,900,000 shares issued in Ernesto's and Romero's names because they were not consultants to the company, did not provide bona fide services to the company, and the shares were issued as part of Majors' and Wolcott's capital raising scheme.

**The February 2004 Press Release**

44.     Maximum and Wolcott used the sham S-8 stock transactions, sham consulting contracts, and related false Form S-8 filings to create the appearance that the company was using independent contractors to provide infrastructure for its alleged "roll-out" in Mexico.  Majors caused Maximum to publicly distribute a press release over the Internet headlined "Maximum

Dynamics, Inc., Secures Major Infrastructure" and dated February 27, 2004 in which he stated,

among other things, that:

> Maximum Dynamics, Inc., a technology solutions and back office services company, announced today that it has secured significant infrastructure resources in Africa, Mexico, China and Europe to support its planned roll-out of products and services in those regions. . . . Maximum has also contracted over 60 professionals and experts in fields related to its business.  An S-8 filing was filed today in which payment to these contractors was made.  More than half of these individuals were contractors who had already been retained and had exceeded their benchmarks.  Their contracts have been extended for additional services and most opted for full payment in stock. 'Based upon the performance of contractors in our last S-8 filing, we are confident that this S-8 filing will be as successful for three reasons,' [CEO Eric] Majors added.  'First, most of these contractors have successful businesses, which is one of our criteria for retaining a contractor.  As a result, most of them are not reliant upon the cash value of the stock to survive and are holding onto most of their stock. . . .  Since these contractors realize that driving value through Maximum increases their personal stake, they are already driving so much business to us that we literally have had to tell them to ease up. . . . Lastly, nearly two thirds of the shares will be held back until performance benchmarks are met, which assures us that results will be achieved.' All of the individuals will receive their certificates when their respective benchmarks have been met.  Agreements are in place that restrict the volume of shares that can be sold during a month period.

45.     The statements in the February 27, 2004 press release were false and

misleading for several reasons.  The so-called contracts with "60 professionals and

experts" referred to by Majors in the press release included the sham December 4, 2003

consulting contract where Maximum supposedly paid 1,900,000 shares of S-8 stock to

Ernesto and Romero.  At the time of the press release, the defendants knew that Ernesto

and Romero had not "opted for full payment in stock," did not have a "personal stake" in

the company, did not provide services to Maximum, and did not receive the S-8 shares

issued in their names.

**Majors and Wolcott's Unregistered Sales of the Consultants' Shares**

46.     Majors and Wolcott laundered at least 8,690,000 shares of the sham S-8 stock through brokerage accounts opened using Ernesto's and Romero's names that were controlled by Majors and Wolcott.  At the time, neither Romero nor Ernesto were aware of the existence of the brokerage accounts.

47.     On or about August 25, 2000, brokerage account number xxxx-6485 was opened at Charles Schwab & Co., Inc., in the name of Europa Global Investments, Inc., a company which listed Ernesto as its director.  On or about September, 11, 2000, brokerage account number xxx-2224 was opened in Ernesto's name at Charles Schwab & Co., Inc.  On or about November 8, 2002, brokerage account number xxxx-8099 was opened in Ernesto's name at J. Alexander Securities.  Ernesto did not control or consent to any of the investment decisions for these three brokerage accounts.  Rather, upon information and belief, Majors and Wolcott directed the offer and sale of securities in the accounts described in this paragraph.

48.     On or about February 14, 2002, brokerage account number xxx-1846 was opened in Romero's name at Charles Schwab & Co., Inc.  On or about August 6, 2002, a second brokerage account number xxx-1233 was opened in Romero's name at Charles Schwab & Co., Inc.  Romero did not control or consent to any of the investment decisions made for these two brokerage accounts.  Rather, upon information and belief, Majors and Wolcott directed the offer and sale of securities in the accounts described in this paragraph.

49.     The following shares issued by Maximum as consideration for the fictitious consulting contracts were deposited into the Ernesto or Romero accounts on or about the dates and in the amounts shown in Table A.

Table A

| Deposit Date | Stock Certificate Number | Number of Shares | Account Name | Account Number |
|---|---|---|---|---|
| May 16, 2003 | 239 | 575,000 | Ernesto | xxxx-2224 |
| July 18, 2003 | 256 | 1,296,000 | Romero | xxxx-1846 |
| July 23, 2003 | 258 | 794,000 | Ernesto | xxxx-2224 |
| July 29, 2003 | 259 | 1,000,000 | Romero | xxxx-1846 |
| December 23, 2003 | 308 | 450,000 | Ernesto | xxxx-2224 |
| December 23, 2003 | 309 | 400,000 | Romero | xxxx-1233 |
| January 2, 2004 | 370 | 250,000 | Ernesto | xxxx-8099 |
| January 2, 2004 | 371 | 300,000 | Europa | xxxx-6485 |
| January 2, 2004 | 372 | 250,000 | Romero | xxxx-8123 |
| March 3, 2004 | 448 | 1,500,000 | Ernesto | xxxx-2224 |
| March 3, 2004 | 450 | 500,000 | Romero | xxxx-1233 |
| **Total Shares** | | **8,690,000** | | |

50.     The shares deposited into the Romero and Ernesto brokerage accounts were sold to the public for approximately $786,241, of which approximately $246,269 was wired to Majors' bank account; $4,544 was used to pay Majors' personal expenses; $32,330 was paid to Wolcott; and $151,323 was withdrawn via Automated Teller Machine transactions.  The remaining balance was distributed to Maximum and used to pay expenses.

**Efforts to Conceal the Scheme from the Commission**

51.     In or around December 2004, the defendants learned that the Commission had contacted Ernesto with questions about Maximum.

52.     The defendants instructed Victor, who was defendants' liaison with Romero, Ernesto, Hugo, and Graciela, on what to say to the Commission.  The purpose of defendants' instructions was to conceal the illegal scheme from the Commission.

53.     On or about December 4, 2004, Victor sent Wolcott an email asking what activities Hugo and Graciela performed for Maximum in exchange for stock.  Among other statements, Victor said "I need to have as much information as possible to them in how to answer questions from the sec [sic]" and "I don't believe there will be a problem as long as I provide them with the knowledge."  Victor wanted to know "the dates when they were signed as contractors and the amount of stock that was issued to each one of them.  If the stock was issued to them and they signed for someone else; did they received [sic] stock in return or? what should they say?"

54.     On or about December 4, 2004, Majors responded to Victor's questions, stating in an email that "Hugo assisted in finding partners" for projects in Mexico, Ernesto helped "find web developers," and "Jesus [Romero] was going to help us find engineers, but he no longer wanted to work with us and so you bought his stock back too."  Majors also said he would send Victor copies of the consulting contracts.

55.     On or about December 10, 2004, Victor sent Majors an email stating that "I already have their contracts.  Joshua [Wolcott] told me where to find them on the SEC Edgar site.  As soon as I have the funds, I will travel to Mexico City to arrange payment for the money we owe them for their services, then I will schedule a conference call between Mexican people and SEC. . . . I suggest to give them the preferred [sic] stock that Joshua gave me under Jaime [Marquez] and Hugo's name, I would like to get the same amount for Ernesto and Graciela."

56.     At the time of the communications described in paragraphs 51-55, Majors, Wolcott, and Victor knew that Ernesto, Romero, Hugo, and Graciela were not Maximum consultants, had not assisted the company in any way, and were not entitled to receive Maximum stock as compensation for consulting services.

## FALSE FORM S-8 REGISTRATION STATEMENTS

57.     Maximum filed a Form S-8 on December 20, 2002, in which the defendants falsely reported that the company issued 750,000 shares to Hugo as compensation for "computer consulting services." Exhibit 4.1, attached to the Form, purported to be a consulting agreement that Hugo signed as "consultant" and Majors signed as chief executive officer of Maximum. Exhibit 4.1 was a sham. Majors and Wolcott knew when they signed the Form S-8 as the persons who would "administer and enforce" the consulting agreements listed in the Form, that Hugo had not seen the consulting contract, did not provide consulting services, and did not receive the shares described in the Form.

58.     Maximum filed a Form S-8 on June 25, 2003 in which the defendants falsely reported that the company issued 1,000,000 shares to Hugo for "software engineering services." Exhibit 4.2, attached to the Form, purported to be a consulting agreement that Hugo and others signed as "independent contractors" and Majors signed as chief executive officer of Maximum. Exhibit 4.2 was a sham. Majors and Wolcott knew when they signed the Form S-8 as the persons who would "administer and enforce" the consulting agreements listed in the Form, that Hugo also had not seen this consulting contract, did not provide consulting services, and did not receive the shares described in the Form.

59.     Maximum filed a Form S-8 on December 16, 2003 in which the defendants falsely reported that the company issued 450,000 shares to Ernesto and 400,000 shares to

Romero as payment for "mPOS Services."  Exhibit 4.3, the "mPOS consulting agreement," attached to the Form, stated that Ernesto and Romero provided "technology development services, business development services, and engineering services for businesses and professionals in the IT and financial services sector, specifically the point of sale (POS) device market."  Majors and Wolcott knew when they signed the Form S-8 as the persons who would "administer and enforce" the consulting agreements listed in the Form, that Ernesto and Romero were not consultants in the point of sale device market or in any other area of expertise described in the contract, did not provide consulting services to Maximum, and did not receive the shares described in the Form.

60.     Maximum filed a Form S-8 on February 27, 2004 that falsely reported that the company issued a total of 1,500,000 shares to Ernesto and 400,000 shares Romero as payment for "MPOS/TagNet product launch in S. Amer."  Exhibit 4.1, the "MPOS Services Agreement," again stated that Ernesto and Romero provided "technology development services, business development services, and engineering services for businesses and professionals in the IT and financial services sector, specifically the point of sale (POS) device market."  As stated earlier, these statements were untrue and Ernesto and Romero were not consultants.  They also did not receive the shares described in the Form.

61.     For each of the Forms S-8 described in paragraphs 57 through 60, Majors signed the Form as president, chief executive officer, and director, and Wolcott signed as chief financial officer and director.  Majors also signed a statement that "the company certifies that it has reasonable grounds to believe that the company satisfies all of the requirements for filing on Form S-8."

## MISSTATEMENTS AND OMISSIONS IN FORM SB-2
## REGISTRATION STATEMENT

62.     On June 20, 2004, Maximum filed a Form SB-2 registration statement ("the registration statement") in connection with a proposed public offering.  The filing contained material misstatements and omitted material information.

63.     The registration statement reported that Europa was a "selling shareholder" which beneficially owned 1.5% of Maximum's outstanding shares and that Europa was the developer of "Datalus" software which was the "platform" for the company's proprietary software.  The registration statement also stated that Maximum had issued two millions shares of stock to Europa to purchase Datalus licensing rights.  In fact, Europa was a complete fiction and there was no software license to purchase.

64.      The registration statement claimed to report all related party transactions but did not disclose the issuance and liquidation of the sham S-8 shares in the nominee brokerage accounts or the distribution of proceeds to related parties.

65.     The registration statement did not disclose that Maximum had not purchased the software, hedge fund administration services, software engineering, technology development services, business development services, and engineering services described in sham consulting contracts attached to Forms S-8 filed on December 20, 2002, June 25, 2003, December 16, 2003, and February 27, 2004.

66.     Majors and Wolcott signed the registration statement in their capacities as officers and directors of the company.  The defendants knew at the time they signed the registration statement that it contained material misrepresentations and omissions of material facts.

## MISSTATEMENTS AND OMISSIONS IN PERIODIC REPORTS

67.     Section 13(a) of the Exchange Act requires issuers, such as Maximum, whose securities are registered with the Commission pursuant to Exchange Act Section 12, to file periodic reports containing information required by Commission rules and regulations. Exchange Act Rule 12b-20 provides that, in addition to the information expressly required, the reports must include any further information necessary to ensure that the required statements are not, under the circumstances, misleading.

68.     Maximum made material misstatements and omissions in its Forms 10-QSB, which were the company's quarterly reports filed with the Commission, related to its alleged relationships with Europa and fictitious consultants.  The misstatements and omissions included the following:

(a)     Form 10-QSB for the quarter ending March 31, 2003, reported that the company had issued 5,090,000 shares to "unrelated third parties" during March 2003 in exchange for "software engineering, marketing, and business development" services.  The accompanying financial statements reported $127,250 in compensation expense for these alleged consulting services.  In fact, 3,296,000 shares, or about 65% of the reported consulting services expense, was for stock placed in the nominee brokerage accounts.  Maximum made similar misstatements in Forms 10-QSB for the periods ending June 30, 2003, September 30, 2003, and March 31, 2004.

(b)     Form 10-QSB for the quarter ending March 31, 2003 falsely reported that the company "secured a five-year exclusive" Datalus software license in August 2000 from Europa in exchange for 2 million shares of common stock.  Europa, however, did not exist. Maximum made similar untrue statements about Europa and the so-called exchange of stock for

licensing rights in Forms 10Q-SB for the quarters ending June 30, 2003, September 30, 2003,

March 31, 2004, June 30, 2004, and September 30, 2004.

      (c)    Form 10-QSB for the quarter ending March 31, 2004, falsely reported that

the company had purchased "ownership" of the Datalus software in February 2004 for an

additional 2 million shares of common stock valued at $200,000.  The company claimed that the

asset purchase included "the platform, all associated technology, and proprietary rights" to the

software.  At the time, Europa  did not exist.  Maximum made similar untrue statements about

Europa's ownership of Maximum stock and the so-called software purchase in Forms 10-QSB

for the quarters ending June 30, 2004 and September 30, 2004.

      (d)    Forms 10-QSB for the relevant periods did not report the funds distributed

to the defendants from the nominee brokerage accounts and therefore understated officers'

compensation.

      (e)    Majors and Wolcott prepared and signed each of the false and misleading

Forms 10-QSB and knew at the time the Forms were filed with the SEC that the documents

contained material misrepresentations and failed to include material facts.  Majors and Wolcott

provided knowing and substantial assistance to Maximum's violations of the reporting

requirements of Exchange Act Section 13(a) and Rules 12b-20 and 13a-13.

    69.    Maximum made material misstatements and omissions in its Forms 10-KSB for

the years ending December 31, 2002 and 2003, which were the company's annual reports filed

with the Commission.  The misstatements and omissions included the following:

      (a)    Form 10-KSB for the year ending December 31, 2002 falsely reported that

Maximum had "secured a five-year exclusive" Datalus software license in August 2000 from

Europa in exchange for 2 million shares of common stock.  The company also claimed that it

"had the right of first refusal to renew the license or acquire technology" from Europa and that Ernesto, was both the "sole officer, director, and principal shareholder of Europa" as well as "one of the incorporators" of Maximum.  Maximum made similar untrue statements in Form 10-KSB for the year ending December 31, 2003.

(b)     Form 10-KSB for the year ending December 31, 2002 falsely reported that Maximum had issued Form S-8 shares as follows:  625,000 shares to Ernesto for "business planning services," 550,000 shares to Romero for "strategic and financial planning services," and 475,000 shares to Elektra Marketing for "marketing and sales consulting services."  Maximum made similar untrue statements in Form 10-KSB for the year ending December 31, 2003.

(c)     Form 10-KSB for the year ending December 31, 2003 reported that defendants did not take cash compensation in 2002 when in fact the defendants took cash from the nominee brokerage accounts.  The company further claimed that its officers were in compliance with the Commission's beneficial ownership reporting requirements when, in fact, the officers did not file the required reports regarding transactions in the nominee brokerage accounts.

(d)     Majors and Wolcott prepared and signed each of the false and misleading Forms 10-KSB and knew at the time the Forms were filed with the SEC that the documents contained material misrepresentations and failed to include material facts.  Majors and Wolcott provided knowing and substantial assistance to Maximum's violations of the reporting requirements of Exchange Act Section 13(a) and Rules 12b-20, and 13a-1.

## FALSE CERTIFICATIONS UNDER SARBANES-OXLEY

70.     Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), which amended the Exchange Act requirements for public companies filing reports, provides that the

Commission shall, by rule, require the principal executive officers and principal financial

officers to certify each quarterly and annual report.  Exchange Act Rule 13a-14 provides that the

principal executive officer or principal financial officer must certify, among other things, that the

officer has reviewed the company's quarterly or annual report and that, based on the officer's

knowledge, the report does not omit or misstate a material fact.

71.    Majors was Maximum's principal executive officer and certified Maximum's

quarterly and annual reports in that capacity.  Wolcott was Maximum's principal financial officer

and certified Maximum's quarterly and annual reports in that capacity.

72.    The defendants' Sarbanes-Oxley certifications were false.  The defendants knew

that Maximum's annual and quarterly reports contained material falsehoods about the purchase

of technical, engineering, and software consulting services; materially overstated the amounts

paid to outside consultants; and materially understated the compensation paid to the defendants.

The defendants also knew that the company's annual and quarterly reports omitted material facts

about its alleged purchase of Datalus software; the company's true relationship with Europa,

Elektra Marketing, Ernesto, Romero, Hugo, and Graciela; and the distributions of unregistered

stock.

## FAILURES TO REPORT INSIDERS' STOCK ACTIVITY

### Reports Required by Exchange Act Section 16(a)

73.    Exchange Act Section16(a) requires beneficial owners of over 10% of any class

of equity security registered under Section 12 of the Exchange Act, and the officers and directors

of any such company (collectively, "insiders"), to file a statement with the Commission reporting

the amount of securities beneficially owned.  A "beneficial owner" includes a person who

"directly or indirectly, through any contract, arrangement, understanding, relationship, or

otherwise" has or shares "voting power" or "investment power."  "Investment power" includes

the power to dispose or to direct the disposition of a security.

74.     Section 16(a) also requires insiders to file statements of any changes in ownership

within ten days after the close of each calendar month.  Form 3 is used for initial statements of

ownership.  Form 4 is used for subsequent changes of ownership.

75.     Majors and Wolcott were beneficial owners of the S-8 stock listed in Table A of

paragraph 49.

76.      Majors filed Form 3 in August 2002 and reported that he beneficially owned 2.5

million shares of Maximum stock and was a 10% owner.

77.     Despite triggering the reporting requirements of Exchange Act Section 16(a),

Majors did not file Form 4 to report the acquisition or sale of the 8,690,000 shares listed in Table

A of paragraph 49.

78.     Wolcott filed Form 3 in November 2002 and reported that he beneficially owned

12.5 million shares of Maximum stock and was a 10% owner.

79.     Despite triggering the reporting requirements of Exchange Act Section 16(a),

Wolcott did not file Form 4 to report the acquisition or sale of the 8,690,000 shares listed in

Table A of paragraph 49.

## Reports Required by Exchange Act Section 13(d)

80.     Section 13(d) of the Exchange Act requires that any person who acquires more

than 5% of a company's class of stock registered under Section 12 to notify the Commission

within ten days of the acquisition by filing Schedule 13D.  Exchange Act Rule 13d-2 requires

that the person notify the Commission of any "material" increase or decrease in the person's

percentage of beneficial ownership by filing an amended Schedule 13D.  A "material" change is a change of one percent or more of the company's total outstanding common shares.

81.     Maximum issued 575,000 shares of sham S-8 stock on January 10, 2003; 4,090,000 shares of sham S-8 stock on July 1, 2003; and 1,650,000 shares of sham S-8 stock on December 23, 2003, to fictitious consultants or to third parties who transferred the stock to the nominee brokerage accounts.  Each issuance increased the company's total outstanding common shares by more than one percent and triggered the reporting requirements of Exchange Act Section 13(d) and Rule 13d-2.

82.     The defendants were beneficial owners of the stock described in paragraph 81 and, at the time of each issuance, were beneficial owners of more than 5% of the company's stock.

83.     Despite triggering the reporting requirements of Exchange Act Section 13(d) and Rule 13d-2, the defendants did not file Schedule 13D to notify the Commission of the material changes in their ownership of Maximum common stock resulting from the stock issuances described in paragraph 81.

## CLAIMS FOR RELIEF

### FIRST CLAIM

Sale of Unregistered Securities
Violations of Securities Act Sections 5(a) and (c)

84.     Paragraphs 1 through 83 are re-alleged and incorporated by reference.

85.     By engaging in the conduct described above, the defendants have directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, offered to sell or sold securities or carried or caused such

securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

86.     No valid registration statement was filed or in effect with the Commission and no exemption from registration existed with respect to the securities and transactions described in this Complaint.

87.     By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e (c)].

## SECOND CLAIM

Fraud in the Offer or Sale of Securities
Violations of Securities Act Section 17(a)(1)

88.     Paragraphs 1 through 83 are re-alleged and incorporated by reference.

89.     By engaging in the conduct described above, the defendants have, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud.

90.     By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. §§ 77q(a)(1)].

## THIRD CLAIM

Fraud in the Offer or Sale of Securities
Violations of Securities Act Sections 17(a)(2) and (3)

91.     Paragraphs 1 through 83 are re-alleged and incorporated by reference.

92.     By engaging in the conduct described above, the defendants have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

(b)   engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

93.   By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2)-(3)].

## FOURTH CLAIM

Fraud in the Purchase or Sale of Securities
Violation of Exchange Act Section 10(b) and Rule 10b-5

94.   Paragraphs 1 through 83 are re-alleged and incorporated by reference.

95.   By engaging in the conduct described above, the defendants have, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce or by use of the mails, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

96.   By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

# FIFTH CLAIM

Aiding and Abetting Reporting Violations
Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13

97.     Paragraphs 1 through 83 are re-alleged and incorporated by reference.

98.     Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13 require issuers of registered securities to file with the Commission annual, quarterly, and current reports.  Exchange Act Rule 12b-20 provides that in addition to the information expressly required in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

99.     As described above, Maximum filed Form 10-KSB annual reports and Form 10-QSB quarterly reports with the Commission that were materially false and misleading or failed to include material information necessary to make the required statements in those reports, in light of the circumstances under which they were made, not misleading.

100.    From in or around April 2003 through in or around December 2004, the defendants aided and abetted Maximum's reporting violations, in that they provided knowing and substantial assistance to Maximum in the filing of Form 10-KSB annual reports and Form 10-QSB quarterly reports that were materially false and misleading or failed to include material information necessary to make the required statements in those reports, in light of the circumstances under which they were made, not misleading.

101.    By reason of the foregoing, the defendants aided and abetted, and unless enjoined, will continue to aid and abet, violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§  240.12b-20, 240.13a-1, 240.13a-13].

## SIXTH CLAIM

Failure to Disclose Change in Ownership by 5% Beneficial Owner
Violation of Exchange Act Section 13(d) and Rule13d-2

102.    Paragraphs 1 through 83 are re-alleged and incorporated by reference.

103.    Section 13(d) of the Exchange Act requires any person who acquires more than 5% of a company's class of stock registered under Section 12 of the Exchange Act to notify the issuer and the Commission within 10 days of the acquisition.  Exchange Act Rule 13d-2 requires the person to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership.  Under Rule 13d-2, an acquisition or disposition of an amount that is equal to 1% or more of any class of securities is always material; an acquisition or disposition of less than 1% may be material depending upon the facts and circumstances.

104.    Majors and Wolcott were beneficial owners of the S-8 stock described in this Complaint.  Maximum issued S-8 stock on January 10, 2003 (575,000 shares); July 1, 2003 (4,090,000 shares); and December 23, 2003 (1,650,000 shares) that were equal to or more than 1% of the company's outstanding common shares.

105.    Majors was the beneficial owner of more than 5% of Maximum common stock from at least in or about January 2003 until at least in or about January 2004, and therefore was required during that period to notify the Commission when he acquired or disposed of a material amount of Maximum common stock.

106.    Wolcott was the beneficial owner of more than 5% of Maximum common stock from at least in or about January 2003 until at least in or about January 2004 and therefore was required during that period to notify the Commission when he acquired or disposed of a material amount of Maximum common stock.

107.    Despite triggering the reporting requirements of Exchange Act Section 13(d) and Rule 13d-2, the defendants did not notify the Commission of the January 10, 2003, July 1, 2003 and December 23, 2003 material increases in their beneficial ownership of Maximum stock.

108.    By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Exchange Act Section 13(d) and Rule 13d-2 [15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d-2].

### SEVENTH CLAIM

Failure to Disclose Insider's Changes in Beneficial Ownership
Violation of Exchange Act Section 16(a)(1) and 16(a)(2)(C) and Rules 16a-2 and 16a-3

109.    Paragraphs 1 through 83 are re-alleged and incorporated by reference.

110.    Exchange Act 16(a) requires beneficial owners of over 10% of a class of equity securities registered under Section 12 of the Exchange Act, and the officers and directors of the issuer of any such security (collectively, "insiders"), to file a statement with the Commission reporting the amount of securities beneficially owned.  Section 16(a) also requires insiders to file statements reporting changes in ownership.

111.    The defendants, who were officers and directors of Maximum, did not notify the Commission of changes in their beneficial ownership of the company's common stock caused by (a) the acquisition and disposition of the S-8 stock issued to Europa and (b) the acquisition and disposition of S-8 stock placed in the nominee brokerage accounts.

112.    By reason of the foregoing, the defendants violated, and unless enjoined, will continue to violate, Exchange Act Section 16(a)(1) and 16(a)(2)(C) and Rules 16a-2 and 16a-3 [15 U.S.C. §§ 78p(a)(1), 78p(a)(2)(C) and 17 C.F.R. §§ 240.16a-2, 240.16a-3].

## EIGHTH CLAIM

False Certifications of Quarterly and Annual Filings
Violation of Section 302 of Sarbanes-Oxley and Exchange Act Rule 13a-14

113.    Paragraphs 1 through 83 are hereby re-alleged and incorporated by reference.

114.    The defendants violated Section 302 of the Sarbanes-Oxley Act of 2002

("Sarbanes-Oxley") and Exchange Act Rule 13a-14 in that they signed and certified Maximum's

Forms 10-KSB and 10-QSB while knowing that the Forms contained material omissions and

material misstatements.

115.    By reason of the foregoing, the defendants violated, and unless enjoined, will

continue to violate, Section 302 of Sarbanes-Oxley and Exchange Act Rule 13a-14 [17 C.F.R. §

240.13a-14].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

### A.

Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining the defendants, their agents,

servants, employees, and attorneys, and all persons in active concert or participation with them,

from violating Securities Act Sections 5(a), 5(c), and 17(a)(1)-(3) [15 U.S.C. §§ 77e(a), 77e(c),

77q(a)(1)-(3)]; Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. §

240.10b-5]; Exchange Act Section 13(d) and Rule 13d-2 [15 U.S.C. § 78m(d) and 17 C.F.R. §

240.13d-2]; Exchange Act Section 16(a)(1) and 16(a)(2)(C) and Rules 16a-2 and 16a-3 [15

U.S.C. §§ 78p(a)(1), 78p(a)(2)(C) and 17 C.F.R. §§ 240.16a-2, 240.16a-3]; and Exchange Act

Rule 13a-14 [17 C.F.R. § 240.13a-14]; and from aiding and abetting any violation of Exchange

Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 [15 U.S.C. §§ 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

## B.

### Disgorgement

Order the defendants to provide an accounting and to disgorge all profits and proceeds received as a result of the acts and courses of conduct in the Complaint, with pre-judgment interest.

## C.

### Civil Penalties

Order the defendants to pay civil penalties, including post-judgment interest, pursuant to Securities Act Section 20(d) and Exchange Act Section 21(d) [15 U.S.C. §§ 77t(d)], 78u(d)].

## D.

### Penny Stock Bar

Issue an Order pursuant to Section 603 of Sarbanes-Oxley, Securities Act Section 20(g), and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)] barring the defendants from participating in an offering of penny stock.

## E.

### Officer and Director Bar

Issue an Order pursuant to Securities Act Section 20(e) and Exchange Act Section 21(d)(2) [15 U.S.C. §§ 77t(e), 78u(d)(2)] barring defendants from serving as an officer or director of any issuer that has a class of securities registered under Exchange Act Section 12.

**F.**

Retention of Jurisdiction

Retain jurisdiction over this action to implement and carry out the terms of all orders and

decrees and to entertain any suitable application of the Commission by motion for additional

relief.

**G.**

Further Relief

Grant such other and further relief as the Court deems necessary.

**JURY DEMAND**

Plaintiff demands a jury trial in this matter.


Dated this 16th day of November 2007.       Respectfully submitted,

s/Barbara T. Wells
Barbara T. Wells
Leslie J. Hughes
Trial Counsel
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202
email:  WellsB@SEC.gov, HughesL@SEC.gov
tel: (303) 844-1005 (Wells)
tel.: (303) 844-1086  (Hughes)
fax:  (303) 844-1068

Counsel for Plaintiff